UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


John W. Robbins


     v.                            Civil No. 09-cv-343-JD
                                     Opinion No. 2010 DNH 143

Michael J. Astrue, Commissioner,
Social Security Administration


O R D E R

John W. Robbins seeks judicial review, pursuant to 42 U.S.C. 405(g), of the decisions of the Appeals Council and the Administrative Law Judge ("ALJ"), denying his application for benefits under Title II and Title XVIII of the Social Security Act.  Robbins contends that the Appeals Council erred in denying his request for review of the ALJ's decision and that the ALJ erred in failing to find that Robbins's statements about his symptoms were fully credible, in determining his residual functional capacity, and in assessing the vocational expert's testimony.  Robbins moves to reverse the Commissioner's decision, and the Commissioner moves to affirm.


Background

John Robbins worked in the Hillsborough-Deering school district as a school psychologist until June 20, 2003.  He

stopped working due to the effects of multiple chemical
sensitivities, which he developed after moving into a new
apartment in February of 2003.  Robbins was forty-one years old
when he stopped working.

On July 29, 2003, Robbins began treatment with Dr. Barry
Elson, an allergist, and told him that he first experienced
symptoms after moving into the new apartment.  Robbins stated
that in response to exposure to certain triggers he experienced
sore throats, headaches, malaise, fatigue, impaired cognition,
and impaired concentration.  Dr. Elson performed physical
examinations at the July appointment and again on August 18,
2003.  The examinations showed adequate air exchange despite a
slight wheeze on forced exhalation and otherwise "unremarkable"
results.  Robbins weighed 270 pounds.  Dr. Elson examined Robbins
again on September 24, 2003, and again found that Robbins was
alert and in no acute distress, that his heart and lungs were
normal, and that he had no acute respiratory distress.

Based on Robbins's report about chemical sensitivity, Dr.
Elson concluded that the best treatment was to avoid exposure to
allow his immune system to recover.  Dr. Elson advised Robbins to
avoid triggers for his symptoms, to use his inhaler, and to walk
every day for twenty to thirty minutes.  In October of 2003, Dr.
Elson estimated that Robbins would need to avoid chemical

exposure until at least June of 2004.  Dr. Elson's treatment
notes end in May of 2004 in the record provided to the ALJ.

From October of 2000 to April of 2008, Robbins was treated
at the Concord Hospital Family Health Center.  He was diagnosed
with multiple chemical sensitivity ("MCS") and hypertension in
November of 2005.  Other examination results during the period
reported that Robbins was alert and in no acute distress, that
his cardiovascular and respiratory systems were normal, and that
he did not have wheezing.  Robbins's medical records for the
period show that he was treated for a variety of ailments
including a swollen eyelid, chest pains, flu-like symptoms,
plugged ears, cough and congestion, and chronic congestion.

Robbins applied for social security disability and
disability insurance benefits on October 23, 2003.  For purposes
of evaluating Robbins's application, Dr. Jonathan H. Jaffe, a
non-examining state agency physician, completed a residual
functional capacity assessment based on Robbins's medical
records.  Dr. Jaffe found that Robbins had multiple chemical
sensitivities and obesity and suffered from headaches and fatigue
and that Robbins's complaints about difficulties with cognition
were credible.  For purposes of his functional capacity, Dr.
Jaffe found that Robbins could occasionally lift or carry twenty
pounds; could frequently lift or carry ten pounds, stand, walk,

and sit for six hours in an eight hour day, and did not have
other physical limitations.  Dr. Jaffe found that Robbins would
need to avoid "heavy concentrations of fumes, dust, and other
noxious materials."

On March 17, 2004, William Swinburne, Ph.D., a psychologist,
evaluated Robbins and concluded that Robbins had mild to moderate
depression which did not interfere with his function as a school
psychologist.  A non-examining state agency psychologist
completed a mental residual functional capacity assessment on
March 29, 2004.  He found that Robbins had a depressive disorder
that did not significantly limit his abilities although Robbins
was mildly restricted in daily activities and social functioning.

Robbins's application for social security benefits was
denied initially on April 2, 2004, and he requested a hearing.  A
hearing was held, and Robbins's application was denied on
December 13, 2005.  After the Appeals Council denied review,
Robbins filed an action in this court.  The parties then agreed
to a remand.  The Appeals Council vacated the ALJ's decision and
remanded the case to the ALJ for reevaluation.

A second hearing was held on September 24, 2008.  Robbins
participated in the hearing by telephone and was also represented
by Jon Reilly, a non-attorney representative.  Robbins's
girlfriend, Melissa McNally, attended the hearing and testified.

4

In addition, a medical expert, Dr. Vern Laing, and a vocational expert, Louis LaPlante, participated in the hearing.  After the hearing, Robbins's representative provided an evaluation of Robbins done by Dr. William Windler, who diagnosed multiple chemical sensitivities and stated that no clinical tests existed to diagnose MCS and that MCS could also produce some psychological disturbance.

On February 10, 2009, the ALJ again determined that Robbins was not disabled.  The ALJ found that Robbins's insured status continued through December 31, 2008, that he had not engaged in substantial gainful activity since June 20, 2003, that he had severe impairments caused by multiple chemical sensitivities and obesity, and that his impairments did not meet or equal a listed impairment.  The ALJ concluded that although Robbins could not return to any of his former work, he was not disabled from all work.  Therefore, the ALJ denied Robbins's application.

Robbins sought review by the Appeals Council and submitted additional treatment notes from Dr. Elson, which had not been submitted to the ALJ.  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Robbins then sought judicial review here.

## Discussion

Robbins contends that the Appeals Council erred in denying his request for review, which included newly submitted evidence. Robbins also contends that the ALJ erred in failing to fully credit Robbins's statements about his impairments, improperly assessed his residual functional capacity, and failed to properly assess the vocational expert's testimony.  The Commissioner moves to affirm the decisions.

## I.   Appeals Council Decision

As noted above, the Appeals Council denied Robbins's request for review, stating that it "looked at the additional progress notes that you submitted but found that they do not provide a basis to change the [ALJ's] decision."  Admin. Rec. at 217. The Appeals Council noted that substantial evidence in the record supported the ALJ's decision, noting the medical expert's testimony and Robbins's activities, and that the ALJ provided reasons for not accepting Dr. Elson's opinion.

Robbins argues that the Appeals Council should have reversed the ALJ's decision because the new medical records from Dr. Elson provided substantial material evidence to support his application

6

for benefits.[1]  In particular, Robbins contends that the records
show that he continued to treat with Dr. Elson through June 25,
2008, and provide information about his medical condition during
that time.  Robbins relies on 20 C.F.R. § 404.970(b), which
provides that the Appeals Council "will review the case if it
finds that the [ALJ'S] action, findings, or conclusion is
contrary to the weight of the evidence currently of record."

Contrary to Robbins's theory, this court's authority to
review a decision of the Appeals Council is limited.  "[T]he
Appeals Council need not and often does not give reasons, and the
regulations appear to provide the Appeals Council with a great
deal of latitude in deciding which cases should be reviewed."
Mills, 244 F.3d at 5.  If the Appeals Council's articulated
decision is egregiously mistaken, such as a statement that newly
submitted evidence is not material when it is material and
undermines the ALJ's decision, the Appeals Council's action is
reviewable.  Id. at 5-6.  On the other hand, an Appeals Council
denial of review, without a stated reason, is effectively
unreviewable.  Id. at 6.

_____

[1]Robbins does not seek a remand to allow the ALJ to consider
Dr. Elson's more recent treatment notes as new and material
evidence.  Importantly, Robbins also does not provide good cause
that would support that request or provide any reason why the
notes were not provided to the ALJ.  See Mills v. Apfel, 244 F.3d
1, 5-6 (1st Cir. 2001).

The more recent treatment notes from Dr. Elson, which were submitted to the Appeals Council but not to the ALJ, apparently pertain to the period from August of 2004 through June of 2008.[2] Robbins contends that the additional notes show continued treatment, which refutes one ground articulated by the ALJ for finding Robbins less than fully credible.  Robbins also contends that the additional notes "provide significant information regarding Mr. Robbins' [sic] ongoing medical issues, the signs and symptoms that he was experiencing and the doctor's assessment."  Mem. at 5.

The ALJ found that Robbins had a residual functional capacity to perform light work with restrictions to avoid temperature extremes and "above average fumes, odors, chemicals, and gases."  The ALJ also found that the severity and persistence of the symptoms Robbins claimed were not substantiated by objective medical evidence.  The ALJ concluded "that [Robbins's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's

_____

[2]The notes for that period included in the administrative record are difficult to read.  In addition, that part of the record was not summarized in the parties' joint factual statement.  See LR 9.1(b)(2) (requiring the statement of facts to "describe all facts pertinent to the decision of the case").  Robbins's memorandum provides excerpts from the treatment notes.  In addition, one of the treatment notes appears to have been written by Michelle Goulet, MSN, FNP, rather than Dr. Elson.

statements concerning the intensity, persistence and limiting
effects of his symptoms are not credible to the extent they are
inconsistent with the above residual functional capacity
assessment."  In support, the ALJ found that Robbins's "limited,
sporadic treatment history and the lack of medically documented
findings of record [were] inconsistent with the alleged severity
of his symptoms and limitations."  The ALJ then addressed the
medical record in detail.

     Although the additional notes show that Robbins treated with
Dr. Elson six times between May of 2004 and June of 2008, which
was missing from the medical records provided to the ALJ, the
notes continue to report the same complaints about the effects of
MCS and other ailments without adding any new medical
information.  Robbins testified at the hearing held on September
24, 2008, in response to the ALJ's questions, that he had been
treated by Dr. Elson once or twice in 2008.  Robbins's personal
representative did not elicit additional information about
Robbins's appointments with Dr. Elson or obtain the records to
submit to the ALJ.

     The Appeals Council concluded that the additional treatment
notes would not provide a basis to change the ALJ's decision.
Taken in the context of all of the evidence, the stated reason is

not egregiously wrong.  Therefore, Robbins has not shown a basis
for reversing the Appeals Council's decision.

II.  ALJ's Decision

     When the Appeals Council denies review, the ALJ's decision
becomes the final decision of the Commissioner.  20 C.F.R. §
404.981.  "[T]he Commissioner employs a five step process to
determine if an individual is disabled within the meaning of the
Social Security Act."  Seavey v. Barnhart, 276 F.3d 1, 5 (1st
Cir. 2001); see also 20 C.F.R. § 404.1520.  If the applicant
shows at Step 4 that he is not able to do his past work, "the
Commissioner then has the burden at Step 5 of coming forward with
evidence of specific jobs in the national economy that the
applicant can still perform."  Seavey, 276 F.3d at 5.  The burden
remains on the claimant, however, to show that he is disabled
within the requirements of the Social Security Act.  See Medhaug
v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)  On review, the
court must affirm the Commissioner's decision if it is supported
by substantial evidence unless it is based on legal error.
Seavey, 276 F.3d at 9.

     In making a disability determination, an ALJ cannot "ignore
medical evidence and substitute his own views for uncontroverted
medical opinion."  Nguyen v. Chater, 172 F.3d 31, 34 (1st Cir.

1999).  On the other hand, the ALJ is expected to resolve

conflicting evidence and his determination must be upheld, even

if the record could support a different conclusion, as long as

substantial evidence supports the ALJ's determination.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.

1991); Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987).  The ALJ's decision is reviewed based

on the evidence of record at the time of the ALJ's decision,

without considering additional evidence submitted to the Appeals

Council.  Mills, 244 F.3d at 4.

     The issues in this case arise from the difficulty of

diagnosing and assessing the effects of MCS.  Both Dr. Elson and

the medical expert at the hearing, Dr. Laing, expressed their

opinions that MCS cannot be diagnosed based on testing and

objective medical evidence.  In that regard, MCS is similar to

ailments such as fibromyalgia and chronic fatigue syndrome, which

are diagnosed based largely on a claimant's subjective

complaints.  See, e.g., Johnson v. Astrue, 597 F.3d 409, 411-12

(1st Cir. 2009); Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994).

Indeed, at the 2008 hearing, Dr. Laing testified that MCS, in

Robbins's case, was not a medically determinable impairment as

recognized by the Social Security Act because Robbins

demonstrated no abnormalities shown by medically acceptable

11

clinical and laboratory diagnostic techniques.  But see Program
Operation Manual System ("POMS") § DI 34515.064; Creamer v.
Callahan, 981 F. Supp. 703, 704-05 (D. Mass 1997) (noting that
MCS is recognized in the Commissioner's POMS and that the
Commissioner agreed to stipulate in that case that MCS was a
medically determinable impairment).

     In Johnson, the claimant's fibromyalgia was diagnosed based
on a combination of subjective complaints of symptoms and
bilateral "trigger points" or tender spots, which were found
during a physical examination.  597 F.3d at 410.  On appeal, the
court noted that fibromyalgia was defined in Stedman's Medical
Dictionary to include bilateral pain, certain point tenderness,
and no laboratory abnormalities.  Id.  The court concluded that
the ALJ improperly decided not to give the claimant's treating
doctor's opinion weight and not to credit Johnson's subjective
complaints of pain because her complaints were consistent with
the fibromyalgia diagnosis and because the record did not provide
evidence that undermined the diagnosis or her complaints of pain.
Id. 411-14.

     In Rose, the First Circuit noted that the claimant was
diagnosed with chronic fatigue syndrome ("CFS"), based on the
history of her symptoms, which was consistent with the definition
of CFS in POMS.  34 F.3d at 18.  The court concluded that the ALJ

erred in failing to credit the CFS diagnosis and in crediting the opinions of non-examining physicians over treating sources due to the nature of CFS, which is not based on objective findings or diagnostic testing.  Id. at 18-19.

Although neither Robbins nor the Commissioner raises the issue, MCS is addressed in POMS under the topic of "Environmental Illness."  § DI 24525.064.  POMS states:  "The principal clinical ecology procedure in diagnosing sensitivity to a chemical or food is the provocation-neutralization technique, in which the patient records symptoms occurring during a 10-minute period immediately following the administration of a test dose of a chemical, food extract, or allergen applied either as a sublingual drop or by subcutaneous or intracutaneous injection."  Id.  Test results are the patient's subjective reports of symptoms.  POMS also states that "in evaluating claims for disability due to environmental illness, all of the claimant's symptoms, signs, and laboratory findings must be considered to determine if there is medically determinable impairment and the impact of any impairment on the claimant's ability to work."  Id.

A.   Credibility Determination

Credibility determinations are made by the ALJ, and when the determination is based upon appropriate factors, it is entitled

13

to deference.  <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829
F.2d 192, 195 (1st Cir. 1987); <u>accord</u> <u>Foley v. Astrue</u>, 2010 WL
2507773, at *7 (D. Mass. June 17, 2010).  To evaluate the
intensity and persistence of symptoms described by an applicant
for social security benefits, the ALJ considers all of the
available evidence, including the applicant's statements, medical
evidence, and opinions or statements from treating and
nontreating sources.  20 C.F.R. § 404.1529(c)(1).  Subjective
symptoms that are reported to cause functional limitations and
restrictions will be considered as long as they "can reasonably
be accepted as consistent with the objective medical evidence and
other evidence."  § 404.1529(c)(3).  In addition, the ALJ will
consider several factors as relevant to subjective symptoms which
include daily activities; the duration, frequency, and intensity
of the symptoms; precipitating and aggravating factors; and
medications and other measures taken to alleviate symptoms.  <u>Id.</u>
The ALJ's decision must include specific reasons to support the
credibility finding.  <u>DeRosa v. Sec'y of Health & Human Servs.</u>,
803 F.2d 24, 26 (1st Cir. 1986).

In this case, the ALJ concluded that Robbins's allegations
about his symptoms were not entirely credible.  Robbins testified
on September 7, 2005, that he was sensitive to the smell of
perfume and cologne, deodorant, detergents, roofing shingles, new

14

construction, food, evergreen trees, swampy water, fresh pavement in the sun, exhaust from two-stroke engines, and skunk.  His personal representative submitted a memorandum with an expanded list of things that triggered Robbins's sensitivities, which added, among other things, all printed materials, tobacco smoke, new paper, new furniture, fresh mowed grass, and new electronic products.

Robbins testified that his chemical sensitivities began after he moved into a new apartment, when he began to experience a sore throat, tightness in his chest, and some confusion.  After two nights in the new apartment, he had to leave.  He then began to be sensitive to people wearing perfume or cologne, which would cause a tightness in his chest and confusion.  His sensitivities progressed, so that the smell of new shingles on the roof of his apartment building was "horrendous", he could not work in a newly constructed school, and he could not tolerate perfume or cologne worn by co-workers or students.  As a result, he stopped working.

At the time of the 2005 hearing, Robbins and his girlfriend, Melissa McNally, had a five-month-old baby, and McNally's three children also lived with them.  Robbins testified that he stayed in a "safe room" which was sealed off from the rest of the house and had two air filters.  He said that he spent more than ninety percent of his time in the room although he did not eat there.

Because Robbins could not tolerate the smell of food, his girlfriend's children used a kitchen in the basement to prepare food.

Robbins also testified that McNally was a teacher and that through her work and daily life she was exposed to things that he could not tolerate.  When she got home at the end of the day, she had to shower and change her clothes before Robbins could interact with her.  Otherwise, he spoke to her through the door of his safe room.  He also said that he could not tolerate the smell of McNally's coffee.

Robbins testified that exposure to triggers sent him into "crisis."  When he smelled something, it would cause him to feel dizzy, cause a tingling in the back of his eyes, and cause confusion.  He explained, "[j]ust a few breaths of something can wipe me out for hours."  Admin. Rec. at 41.

At the hearing held on September 24, 2008, Robbins testified to a similar list of triggers:

> perfume, cologne, deodorants, hairspray, dryer sheets or [drying laundry], laundry detergent, candles, newsprint, magazine print, book print, sometimes the smell of paper, almost any cleaning agent, shampoos, soaps, newer carpets, fresh paint, fresh pavement on the road or asphalt shingles, auto and truck exhaust and motorcycle exhaust, wood smoke, the smell of skunks, plastic and vinyl products . . . ., sometimes the car heater and the heat in the house is an issue.[3]

---

[3]Robbins also submitted a memorandum to Dr. Elson in 2005 that included the following additional triggers:  gum, breath

16

Admin. Rec. at 253.   Robbins did not add any information at the 2008 hearing about his impairments or reaction to triggering smells.

McNally testified about the impact of Robbins's sensitivities on their life.  She said that she had three older children and that she and Robbins had two children together, born in 2005 and 2006.  She also said that he could not socialize as he had before developing sensitivity to chemicals, that she had to be careful about toys she brought into the house, that he could not attend medical appointments with her while she was pregnant, that he could not go to the older children's schools, and that they went to the beach on drizzly days to avoid the smells of bug spray and sunscreen lotion.  Neither McNally nor Robbins testified about the "safe room" at the 2008 hearing.

In his decision, the ALJ stated that he did not find Robbins's complaints entirely credible because of "his limited, sporadic treatment history and the lack of medically documented objective findings of record."  Admin. Rec. at 234.  The ALJ

———————————

mints, mouthwash, toothpaste, chapstick, new clothes, tobacco smoke, chemical lawn sprays, bug spray, new paper, newer furniture, gasoline, fuel oil, the smell of food, new electronic products, fumes from electronic products, freshly mowed grass, blooming plants, standing water, adhesives, and evergreens. Admin. Rec. at 215.  Neither Robbins nor his personal representative explained at the hearing whether the additional triggers were no longer a problem.

reviewed Robbins's medical records in detail.  He noted that
"[d]espite [Robbins's] alleged sensitivity to a myriad of
chemicals which result in multiple, varied symptoms including:
neck stiffness, eye twitching, difficulty focusing, diarrhea,
skin rashes, etc. [citation to the record], [Robbins's] medical
providers fail to repeatedly note [sic] any such documented signs
and symptoms upon examination."  Admin. Rec. at 236.  The ALJ
also noted that despite the sensitivities and reactions Robbins
claimed, he was "able to operate a motor vehicle, to shop on
occasion, and to reside in a home with five children, including
three active school-age children, and to care for two young
children while his wife is at work."  Id.

Robbins argues that the ALJ erred in considering his limited
and sporadic treatment and the lack of objective medical findings
as a basis to discount his credibility.  He argues that his
treatment was limited and sporadic because he did not have
medical insurance and because the treatment for MCS is to avoid
triggering smells rather than to pursue medical intervention.  He
also argues that because the Merck Manual (18th ed. 2006)
provides that diagnosis of MCS is made by exclusion and that
"physical examination is characteristically unremarkable," the
ALJ erred in considering his limited treatment history and the
lack of medically documented findings.

As the ALJ noted, none of the doctors who examined Robbins observed the extreme symptoms that Robbins alleges were caused by his sensitivity.  At most, the various treating doctors noted occasional mild symptoms.  It is the lack of observable symptoms that is noteworthy.

Robbins was examined by several doctors in their offices during the period that he otherwise lived in a "safe room" in his house.  Although he testified that he could tolerate no contact with people, because of the smells of detergent, fabric softener, perfume, cologne, tea, coffee, and food, among other things, and that he could not tolerate indoor air quality in most buildings or exhaust fumes, machines, print, and many other smells, without going into "crisis" or having other extreme symptoms, Robbins was able to attend medical appointments and be examined without demonstrating any of the symptoms he described.  His medical providers not only did not find the symptoms Robbins claimed, they also repeatedly noted that Robbins was alert and in no acute distress and that his examinations were unremarkable.[4]  He was also able to care for one and then two young children, as the ALJ noted.  Therefore, substantial evidence supports the ALJ's

[4]For example, Dr. Swinburne, a psychologist, evaluated Robbins in March of 2004, and found no signs of thought disorder and found that Robbins's concentration and task completion were not affected by MCS or depression.

19

finding that the degree of intensity and persistence of symptoms
that Robbins claimed was not entirely credible.[5]

### B.  Residual Functional Capacity

As is noted above, the ALJ determined that Robbins was
capable of doing light work as long as he was not exposed to
temperature extremes or "above average fumes, odors, chemicals,
and gases."  Robbins contends that the ALJ's residual functional
capacity assessment is wrong because he failed to give
controlling weight to Dr. Elson's opinions and to the medical
records pertaining to the severity of his sensitivity to chemical
exposure.  Robbins also contends that the ALJ failed to consider
the effects of his severe obesity on his residual functional
capacity.  The Commissioner contends that the ALJ properly
evaluated Dr. Elson's opinions and the record evidence.

Residual functional capacity "is what an individual can
still do despite his or her limitations."  SSR 96-8P, 1996 WL
374184, at * 2 (S.S.A. July 2, 1996).  An applicant's residual
functional capacity is an issue for the ALJ to determine, based
on the record.  20 C.F.R. § 404.1527(e)(2).  The residual

---

[5]In addition, Dr. Elson's prognosis was that avoiding
exposure to triggering smells would allow Robbins's immune system
to heal.  Despite Robbins's avoidance of triggering smells for
approximately five years, he claimed the same triggers and
symptoms in 2008 that he had described in 2003.

functional capacity determination must be based on all of the relevant evidence in the applicant's record and must provide a narrative discussion of the assessment.  SSR 96-8P, 1996 WL 374184, at *5 & 7.  Although an ALJ cannot assess a claimant's residual functional capacity from raw medical data, the ALJ may "render[] common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment."  Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).

      1.  Evaluating Medical Opinions

     In evaluating the medical evidence pertaining to residual functional capacity, the ALJ generally gives medical opinions based on an examination more weight than opinions based on a review of the record.  § 404.1527(d)(1).  In addition, the ALJ generally gives more weight to the opinions of treating sources because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."  § 404.1527(d)(2).  A treating source's opinion "on the nature and severity" of the applicant's impairment is given

controlling weight if it is "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence" in the
record.   Id.   On the other hand, however, a medical source's
opinion that an applicant is disabled or unable to work does not
establish that issue.   § 404.1527(e)(1).

     Robbins contends that the ALJ erred in finding that
Robbins's residual functional capacity required him to avoid only
above average levels of fumes, odors, chemicals, and gases.
Robbins argues that determination improperly failed to give
controlling weight to Dr. Elson's opinion that Robbins could not
be exposed to any chemicals.   In support, Robbins cites a letter
written by Dr. Elson on August 18, 2003, in which Dr. Elson
explained that the best treatment for MCS is to avoid exposure in
order to regain health and to be able to tolerate some exposures
without reactions.   Dr. Elson further explained that generally
MCS patients require a chemical-free work environment, and that
Robbins would not be able to tolerate the chemicals in new
construction, which would prevent him from continuing in his
previous job that would require working in a new school.

     For purposes of his decision issued on February 10, 2009,
the ALJ considered Dr. Elson's records and opinions.   The ALJ
found that Dr. Elson did not document any medical findings to
support the level of sensitivity Robbins claimed.   To the

22

contrary, all of the examinations and testing showed a lack of symptoms, other than some mild symptoms, and gave normal results.

The ALJ found that Dr. Elson's opinion that Robbins could not be constantly exposed to chemicals that would be present in new construction was entitled to some weight, so that Robbins was precluded from work that would constantly expose him to fumes, odors, chemicals, and gases associated with new construction. With respect to Dr. Elson's opinion that Robbins would have to avoid all of the innumerable triggering smells, including the indoor air in any building, the ALJ found that opinion was inconsistent with the medical records which lack any objective findings to support that level of sensitivity.[6]  As a result, the ALJ gave little weight to that opinion.  The ALJ noted that Dr. Elson's signed statement, dated June 25, 2008, stating that all of Robbins's symptoms are consistent with his medical condition, was not supported by any treatment records, because Dr. Elson's last treatment note was dated in May of 2004.

---

[6]As is noted above, the cited lack of medical records to document the level of sensitivity Robbins reports is not a lack of objective testing and physical results, which are not possible in diagnosing MCS, but instead are the lack of symptoms during Robbins's visits to medical providers.  Cf. Johnson, 597 F.3d 411-12 (holding ALJ's residual functional capacity assessment was flawed for claimant with fibromyalgia because ALJ discounted opinion of a treating source due of a lack of objective medical findings).

The ALJ also accorded weight to the opinion of the medical
expert, Dr. Vern Laing, who testified at the 2008 hearing.  Dr.
Laing is board certified in allergy, asthma, and immunology,
along with internal medicine.  Dr. Laing reviewed Robbins's
medical records for the purpose of giving opinions on Robbins's
impairments.  He noted the lack of objective medical
documentation of Robbins's illness and determined that Robbins
did not have a serious medically determinable impairment as that
is defined by the Social Security Administration.  The ALJ
further noted that Dr. Laing's opinion was consistent with the
opinions of the medical consultants.  In addition, the
consultative physician, Dr. Jaffe, assessed Robbins's residual
functional capacity, which supports the ALJ's assessment.

The ALJ properly explained the basis for his decision not to
give substantial weight to Dr. Elson's opinions, which complies
with his obligations under the social security regulations.
Substantial evidence supports the ALJ's conclusion.

### 2.  Evaluating Effects of Obesity

Robbins is correct that although the ALJ found that
Robbins's obesity was a severe impairment, the ALJ did not
expressly consider obesity in making the residual functional
capacity assessment.  As the Commissioner points out, however,
the ALJ limited Robbins's exertional capacity to light work and

nothing in the record suggests that Robbins's obesity would require further reduction in his capacity.  Robbins contends that the symptoms of headaches, malaise, and fatigue, which he claimed resulted from MCS, were "obvious symptoms" of extreme obesity, but he provides no record evidence to support his self-diagnosis. In fact, because Robbins reported to his treating sources that those symptoms are caused by his MCS, his new theory that the same symptoms are caused by obesity contradicts the medical evidence.  Further, he does not explain what additional limitations should have been added to his residual functional capacity due to his obesity.

Although the ALJ should have expressly considered the effect of Robbins's obesity in making his residual functional capacity determination, Robbins has not shown any error resulted from the omission.

### C.  <u>Vocational Expert</u>

Robbins contends that the hypothetical the ALJ posed to the vocational expert for Robbins's impairments and limitations was erroneous because he did not include the limitation that Robbins is severely obese.  Robbins also contends that the ALJ erred in failing to consider the vocational expert's opinion that few jobs were available if Robbins were unable to appear in public places and that no jobs were available if he could not tolerate exposure

to paper, inks, newsprint, and magazines.  The Commissioner
argues that the hypothetical was supported by the medical
evidence.

For a vocational expert's opinion to be relevant to the
disability determination, the hypothetical posed to the
vocational expert must be based on substantial record evidence.
Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427,
429 (1st Cir. 1991); Arocho v. Sec'y of Health & Human Servs.,
670 F.2d 374, 375 (1st Cir. 1982).  If the ALJ has determined,
properly, that the claimant's subjective complaints are not
entirely credible, those limitations need not be included in the
hypothetical to the vocational expert because it is the ALJ's
province to determine credibility.  See Evangelista v. Sec'y of
Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).

Robbins's objections to the hypothetical considered by the
ALJ are based on limitations that he claimed but that the ALJ
found were not substantiated in the medical records.  The ALJ
concluded that Robbins could tolerate exposure up to an average
level of fumes, odors, chemicals, and gases.  Although Robbins
stated that he could not tolerate any exposure to a long list of
triggering smells or the air in public buildings, the medical
evidence also showed that he experienced at most occasional mild
symptoms when visiting doctors' offices for appointments, which
is contrary to his subjective complaints.

The ALJ's hypothetical to the vocational expert was based on his credibility determination and his assessment of Robbins's residual functional capacity, which have been upheld.  Therefore, the hypothetical posed to the vocational expert is supported by the record evidence.

### Conclusion

For the foregoing reasons, the claimant's motion to reverse the decision of the Commissioner (document no. 9) is denied.  The Commissioner's motion to affirm (document no. 10) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

August 9, 2010

cc:  Maureen Raiche Manning, Esquire
     Gretchen Leah Witt, Esquire